UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
THOMAS GESUALDI, LOUIS BISIGNANO,
ANTHONY D'AQUILA, MICHAEL O'TOOLE,
BENNY UMBRA, JOSEPH A. FERRARA, SR.,
FRANK H. FINKEL, MARC HERBST, DENISE            MEMORANDUM & ORDER
RICHARDSON, and THOMAS F. CORBETT, as           14-CV-0765(JS)(AKT)
Trustees and fiduciaries of the Local
282 Pension Fund,

                    Plaintiffs,

          -against-

SCARA-MIX, INC.,

                    Defendant.
---------------------------------------X
APPEARANCES
For Plaintiffs:     Arthur Joseph Muller, Esq.
                    Jonathan Michael Bardavid, Esq.
                    Christopher A. Smith, Esq.
                    Trivella & Forte, LLP
                    1311 Mamaroneck Avenue, Suite 170
                    White Plains, NY 10605

For Defendant:      Benjamin A. Karfunkel, Esq.
                    David William New, Esq.
                    Herbert New & David New, P.C.
                    1129 Bloomfield Avenue, Suite 215
                    West Caldwell, NJ 07006


SEYBERT, District Judge:

          Pending before the Court are: (1) Thomas Gesualdi, Louis

Bisignano, Anthony D'Aquila, Michael O'Toole, Benny Umbra, Joseph

A. Ferrara, Sr., Frank H. Finkel, Marc Herbst, Denise Richardson

and Thomas F. Corbett's (collectively "Plaintiffs") motion for

partial summary judgment seeking liquidated damages, fees, and

costs (Pls.' Damages Mot., Docket Entry 70); (2) Plaintiffs' motion

for a writ of attachment (Pls.' Attach. Mot., Docket Entry 73); and (3) Defendant Scara-Mix, Inc.'s ("Defendant" or "Scara-Mix") motion to dismiss for lack of subject matter jurisdiction (Def.'s Mot., Docket Entry 86). For the following reasons, Defendant's motion to dismiss is DENIED, Plaintiffs' motion seeking damages is GRANTED, and Plaintiffs' motion for a writ of attachment is DENIED.

BACKGROUND

I.   Factual Background

        The Court assumes familiarity with the facts and procedural history of this matter, which are detailed in Magistrate Judge A. Kathleen Tomlinson's Report and Recommendation dated February 7, 2017 (the "R&R," Docket Entry 64) and this Court's Order dated March 10, 2017, Gesualdi v. Scara-Mix, Inc., No. 14-CV-0765, 2017 WL 945090 (E.D.N.Y. Mar. 10, 2017).

        On February 4, 2014, Plaintiffs, as Trustees and fiduciaries of the Local 282 Pension Fund (the "Fund"), commenced this action to collect withdrawal liability pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381, et. seq. ("MPPAA"). (Am. Compl., Docket Entry 8, ¶ 1.) Plaintiffs also seek interest, liquidated damages, and attorneys' fees and costs in accordance with Sections 502 and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145, and Section 301 of the Labor-

Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185. (Am. Compl. ¶ 1.)

Defendant was a party to a Collective Bargaining Agreement (the "CBA") with Building Materials Teamsters Local 282 (the "Union"), which required that Defendant make contributions to the Fund on behalf of its covered employees. (Am. Compl. ¶¶ 10-11.) In addition to the CBA, Defendant and the Union entered into a trust agreement (the "Trust Agreement"), the terms of which were incorporated into the CBA. (CBA, Smith Decl. Ex. A, Docket Entry 51-3; Trust Agmt., Smith Decl. Ex. B, Docket Entry 51-4.) In July 2012, Defendant ceased its contributions and withdrew from the Fund. (Am. Compl. ¶¶ 13, 15.) On July 1, 2013, the Fund demanded payment of Defendant's "proportionate share of the . . . Fund's unfunded vested benefits," known as withdrawal liability, which it calculated as $3,677,184.00. (Am. Compl. ¶¶ 16-17.) In the same letter, the Fund provided Defendant with a payment schedule under which it "could remit its withdrawal liability in eighty seven . . . consecutive monthly installments of . . . $52,617.81 per month, starting August 1, 2013 plus a final payment of . . . $14,920.35." (Am. Compl. ¶ 17.)

Defendant failed to make the first scheduled payment on August 1, 2013, and Plaintiffs notified Defendant that "failure to cure the default within sixty (60) days would result in the acceleration of the entire amount of withdrawal liability." (Am.

Compl. ¶ 18.)  By letter dated August 14, 2013, the President of Scara-Mix informed the Fund that "Scara Mix, Inc. ceased all operations in or about July 2012 and [was] insolvent" (the "August 2013 Letter").  (Aug. 2013 Letter, Karfunkel Decl., Ex. E, Docket Entry 86-7.)  The August 2013 Letter further stated that Scara-Mix "ha[d] no assets with which to satisfy any of the claims being made by the Funds for alleged contribution deficiencies."  (Aug. 2013 Letter.)  Thereafter, Defendant filed a demand for arbitration disputing the imposition of withdrawal liability.  (Am. Compl. ¶ 19.)  Plaintiffs maintain that, notwithstanding the ongoing arbitration proceeding, they are entitled to accelerate the payments.  (Am. Compl. ¶¶ 20-23.)

II.  <u>Procedural History</u>

On May 6, 2016, Plaintiffs filed a motion for partial summary judgment requesting that the Court "accelerate the $3,677,184.00 withdrawal liability balance and enter judgment requiring Defendant to immediately pay th[e] balance" and award 29 U.S.C. § 1132 damages, including liquidated damages, attorneys' fees, costs, and disbursements.  (Pls.' First Mot. Br., Docket Entry 51-14, at 1.)  On October 13, 2016, the undersigned referred the motion to Judge Tomlinson for a Report and Recommendation on whether the motion should be granted, and if necessary, to determine the appropriate amount of damages, costs, and/or fees to be awarded.  (Referral Order, Docket Entry 63.)

On February 7, 2017, Judge Tomlinson issued her R&R and recommended that the Court grant Plaintiffs' motion for partial summary judgment in part and deny it in part. (R&R at 46.) Specifically, she recommended that the Court order Defendant to pay the entire amount of outstanding withdrawal liability on an interim basis pursuant to 29 U.S.C. § 1399(c)(5)(B) and the relevant plan rules. (R&R at 46.) However, she was careful to point out that the ultimate determinations on the default and acceleration issues were within the purview of the arbitrator. (R&R at 46.) Additionally, because Plaintiffs failed to submit documentation to support their requests for damages, fees, and costs, she recommended that the Court allow Plaintiffs to submit a separate motion to address those issues. (R&R at 46.)

Relevant here, Judge Tomlinson recognized that particularly when the parties dispute certain facts related to the imposition of withdrawal liability, the dispute must be arbitrated. (R&R at 21.) As such, she focused on the "narrow issue . . . [of] whether Plaintiffs have a statutory and regulatory right to effectively demand, on an interim basis, the entire withdrawal liability payment pending the arbitrator's final decision on the merits." (R&R at 24.) After examining the statutory language, the purpose of the applicable provisions, and the relevant case law, Judge Tomlinson concluded that a plan was empowered to find an employer in default and accelerate payment of

the full amount of withdrawal liability while an arbitration is pending. (R&R at 32.) With regard to the specific circumstances in this case, Judge Tomlinson analyzed the plan rules and held that the August 2013 Letter notifying the Fund that Defendant was insolvent constituted a reasonable basis for finding Defendant in default and, as a result, Plaintiffs were entitled to accelerate payment. (R&R at 35-38.)

On March 10, 2017, this Court adopted Judge Tomlinson's recommendation in its entirety. Gesualdi, 2017 WL 945090, at *1. The Court directed Defendant "to make an accelerated payment of the entire withdrawal liability amount allegedly due based on its default within twenty (20) days . . . subject to a final determination by the arbitrator." Id. at *3. The undersigned also directed Plaintiffs to file a separate motion addressing their requests for damages and attorneys' fees and costs. Id. Plaintiffs filed their motion on April 14, 2017. (See Pls.' Damages Mot.) Defendant has not opposed this motion.

On April 21, 2017, Plaintiffs moved for an order restraining Defendant's assets and attaching royalty payments allegedly owed to Scara-Mix (the "Attachment Motion"). (See Pls.' Attach. Mot.) Defendant opposed the Attachment Motion on May 12, 2017, and Plaintiffs filed their reply on May 19, 2017. (Def.'s Attach. Opp., Docket Entry 75; Pls.' Attach. Reply, Docket

Entry 76.)  Defendant was subsequently denied leave to file a sur-reply. (Electronic Order, June 16, 2017.)

On August 31, 2017, while those motions were pending, Defendant filed a motion to dismiss for lack of subject matter jurisdiction (the "Motion to Dismiss").  (See Def.'s Mot.) Defendant argues that the Court lacks jurisdiction over Plaintiffs' default and acceleration claims and urges the Court to vacate its March 10, 2017 Order.  (Def.'s Br., Docket Entry 86-1, at 1.)  Plaintiffs opposed the Motion to Dismiss on September 15, 2017, and Defendant filed a reply in further support of its motion on September 25, 2017.  (Pls.' Opp., Docket Entry 88; Def.'s Reply, Docket Entry 89.)

## DISCUSSION

Because Defendant's Motion to Dismiss implicates the Court's subject matter jurisdiction, the Court will address that motion before determining whether Plaintiffs are entitled to damages, fees, costs, or a writ of attachment.

I.   Defendant's Motion to Dismiss

A.  Legal Standard

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  In resolving a motion to dismiss for lack of subject matter jurisdiction, the

Court may consider affidavits and other materials beyond the pleadings. See Morrison v. Nat'l Austl. Bank, Ltd., 547 F.3d 167, 170 (2d Cir. 2008), aff'd, 561 U.S. 247, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010). Though the Court must accept the factual allegations contained in the Amended Complaint as true, it will not draw argumentative inferences in favor of Plaintiff; subject matter jurisdiction must be shown affirmatively. See id. Additionally, "[a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Makarova, 201 F.3d at 113.

B.   Withdrawal Liability

"'Withdrawal liability is part of a comprehensive legislative scheme designed to address the adverse consequences that arise when individual employers terminate their participation in, or withdraw from, multiemployer pension plans.'" Gesualdi v. Seacost Petroleum Products, Inc., 97 F. Supp. 3d 87, 97 (E.D.N.Y. 2015) (quoting Burke v. Hamilton Equip. Installers, Inc., 02-CV-0519, 2006 WL 3831380, at *4 (W.D.N.Y. Oct. 16, 2006)). Specifically, if an employer withdraws from a pension plan, the employer is responsible for its "proportionate share of the pension plan's unfunded vested benefits," Trustees of Local 138 Pension Trust Fund v. F.W. Honerkamp Co. Inc., 692 F.3d 127, 130 (2d Cir. 2012), and the fund "is vested with the authority to determine the amount of withdrawal liability" Seacost, 97 F. Supp. 3d at 97.

Thereafter, the fund must notify the employer of the withdrawal liability due, formulate a payment schedule and demand payment. Id. Upon receiving notice, the employer must comply with the payment schedule within sixty days. Id.; 29 U.S.C. § 1399(c)(2). If there is a dispute regarding the employer's withdrawal liability, the employer must request a review by the plan sponsor, and if that review does not resolve the dispute, the employer must initiate arbitration. Finkel v. Athena Light & Power LLC, No. 14-CV-3585, 2016 WL 4742279, at *6 (E.D.N.Y. Sept. 11, 2016); 29 U.S.C. § 1399(b)(2)(A); 29 U.S.C. § 1401(a)(1).

If the employer chooses to arbitrate the withdrawal liability dispute, the employer must continue to make payments until the arbitrator renders his decision, after which the payments will be adjusted to address any "overpayments or underpayments arising out the decision of the arbitrator." 29 U.S.C. § 1401(d); Cent. States Se. and Sw. Areas Pension Fund v. O'Neill Bros. Transfer & Storage Co., 620 F.3d 766, 768 (7th Cir. 2010) ("The employer may seek review of these calculations and then challenge the plan's determination in arbitration, but it must pay even while the review and arbitration are pending."). In other words, employers are required to "pay now" and "dispute later." O'Neill, 620 F.3d at 772; Rao v. Prest Metals, 149 F. Supp. 2d 1, 5 (E.D.N.Y. 2001) ("ERISA is a pay-first-question-later statute in that the employer must make withdrawal liability payments regardless of

whether there is a dispute as to the assessment of liability.")
(internal quotation marks and citation omitted).

If the employer is determined to be in default, "a plan
sponsor may require immediate payment of the outstanding amount of
an employer's withdrawal liability, plus accrued interest on the
total outstanding liability from the due date of the first payment
which was not timely made."  29 U.S.C. § 1399(c)(5); Tr. of Local
531 Pension Plan v. Corner Distribs., Inc., No. 07-CV-529, 2008 WL
2687085, at *4 (E.D.N.Y. July 8, 2008).  The statute provides two
definitions of default.  Under Section 1399(c)(5)(A), an employer
defaults upon his failure to "make, when due, any payment under
this section, if the failure is not cured within 60 days after the
employer receives written notification from the plan sponsor of
such failure" (a "Missed Payment Default").   29 U.S.C.
§ 1399(c)(5)(A); Corner Distribs., 2008 WL 2687085, at *4.
Pursuant to Section 1399(c)(5)(B), an employer is in default upon
the occurrence of "any other event defined in rules adopted by the
plan which indicates a substantial likelihood that an employer
will be unable to pay its withdrawal liability" (an "Insecurity
Default").  29 U.S.C. § 1399(c)(5)(B); Corner Distribs., 2008 WL
2687085, at *4.  Thus, when an event occurs which the plan has
designated as one indicating a substantial likelihood of the
employer's inability to pay, "the plan[ ] may accelerate the entire
amount of withdrawal liability."  O'Neill, 620 F.3d at 771.

C.  The Parties' Arguments

Defendant contends that the Court lacks jurisdiction because "the Fund's attempt to accelerate the entire withdrawal liability, while arbitration is pending, is an issue solely within the jurisdiction of an arbitrator." (Def.'s Br., Docket Entry 86-1, at 2.)  Defendant relies on GCIU-Employer Retirement Fund v. Vanard Lithographers, Inc., No. 12-CV-5169, 2013 WL 12080961 (C.D. Cal. June 7, 2013), for support, arguing that under similar circumstances, the Vanard court found that disputes related to a default are reserved for the arbitrator.  (Def.'s Br. at 4-5.) Defendant points to several factual disputes related to whether it was properly determined to be in default.  (Def.'s Br. at 5-6.) As discussed above, this issue was addressed by Judge Tomlinson in her R&R, and several of Defendant's arguments appear to be belated objections to that R&R.  (Def.'s Br. at 11-12.)  For example, Defendant attempts to distinguish Central States Southeast & Southwest Areas Pension Fund v. O'Neill Brothers Transfer & Storage Co., 620 F.3d 766, (7th Cir. 2010), a case relied on by Judge Tomlinson.  It argues that O'Neill is not analogous for several reasons, including because the defendant in that case did not dispute whether a default had occurred. (Def.'s Br. at 12.)  As relief, Defendant requests that the Court vacate the March 10, 2017 Order, defer to the arbitrator on the default and acceleration

issues, and dismiss any claims contained in the Amended Complaint seeking acceleration.  (Def.'s Br. at 14.)

Relying on cases from the First and Seventh Circuit Courts of Appeals, Plaintiffs argue that it is within the Court's jurisdiction to determine whether acceleration or payment of withdrawal liability is warranted while an arbitration is pending. (Pls.' Opp. at 1, 5-8.)  Plaintiffs contend that they are entitled to demand the entire withdrawal liability amount on an accelerated basis under the terms of the Trust Agreement and pursuant to 29 U.S.C. § 185.  (Pls.' Opp. at 10-11.)  Alternatively, Plaintiffs argue that, even if the determination of withdrawal liability is reserved for the arbitrator, Defendant waived its right to arbitration by failing to submit this issue to the arbitrator. (Pls.' Opp. at 1.)  Finally, Plaintiffs request that if Defendant's motion is granted, the Court modify its March 10, 2017 Order to direct Defendant to pay $2,639,890.50, the total amount of outstanding withdrawal liability payments due, instead of the entire accelerated amount of $3,677,184.00.  (Pls.' Opp. at 2.)

On reply, Defendant maintains that the relevant issue is whether the Court has jurisdiction to accelerate the full amount of withdrawal liability--not whether the Court may direct Defendant to make the installment payments that are past due. (Def.'s Reply at 3.)  Defendant also argues that Plaintiffs' request that the Court modify its prior Order in the event that

Defendant's motion is granted is procedurally improper.  (Def.'s Reply at 3.)  Finally, Defendant contends that 29 U.S.C. § 185 does not apply to these facts and that it has not waived its right to arbitration.  (Def.'s Reply at 8-9.)

D.  Analysis

Defendant's arguments are without merit.  It is well-settled that the arbitrator must determine whether Plaintiffs properly declared Defendant to be in default and accelerated the withdrawal liability.  See O'Neill, 620 F.3d at 772 ("[T]he propriety of the plan's default determination is beyond the scope of our review at this juncture."); 29 U.S.C. § 1401(a)(1); see also Finkel, 2016 WL 4742279, at *5 ("'ERISA requires that all disputes arising out of a determination made under the withdrawal liability sections must be arbitrated.'") (quoting Rao, 149 F. Supp. 2d at 6).  Consistent with this principle, Judge Tomlinson's R&R and this Court's subsequent Order did not find that Plaintiff's default determination was proper, and in fact, expressly reserved that issue for the arbitrator.  (See R&R at 38, n.8 ("The Court again stresses that its determination at this stage of the proceedings is limited to whether, as a matter of law, Plaintiffs possessed the authority to find Defendant in default and accelerate payment during the pendency of the arbitration.").)  In its motion, Defendant repeatedly mischaracterizes the Court's prior Order and implies that the Court found that the acceleration of Defendant's

withdrawal liability was proper.  (See, e.g., Def.'s Br. at 11.)
However, the Court's prior Order determined only that Defendant
was required to make an interim payment of the entire amount
pending the outcome of the arbitration.  See Gesualdi, 2017 WL
9450910, at *3.  The Court did not resolve the factual issues
surrounding Defendant's default nor conclude that Plaintiffs'
determination was correct.  Thus, any argument relying on that
premise unquestionably fails.

As discussed, the relevant inquiry is whether the Court
has the authority to direct Defendant to make an interim payment
of the accelerated amount pending the outcome of the arbitration.
While the Second Circuit has not addressed this specific issue,
the Court finds the reasoning of several courts outside of this
Circuit to be instructive.  For example, in O'Neill, the Seventh
Circuit held that when a plan declares an employer to be in default
under the Insecurity Default provision (Section 1399(c)(5)(B)),
the plan may properly accelerate the entire amount of withdrawal
liability while the arbitration is pending.  O'Neill, 620 F.3d at
775.  In that case, the employer informed the plan that it was
"preparing for its termination and liquidation," and the plan
declared the employer to be in default and accelerated its
withdrawal liability pursuant to section 1399(c)(5)(B) and the
events specified in the plan rules.  Id. at 771 (internal quotation
marks and citation omitted).  As an initial matter, the court

recognized that the ultimate finding as to the "propriety of the plan's default determination" was required to be made by the arbitrator. Id. at 772. Nonetheless, the court concluded that because "withdrawal liability is ordinarily payable during the pendency of the arbitration" and because the relevant statutes and regulations did not foreclose acceleration after an Insecurity Default while an arbitration is pending, the employer was required to remit the entire accelerated amount of withdrawal liability upon the occurrence of an Insecurity Default.[1] Id. at 772-75. Additionally, several other courts have come to the same conclusion. See, e.g., Cent. States, Se. and Sw. Areas Pension Fund v. Tel. Paving Co., Inc., No. 09-CV-7801, 2010 WL 3516169, at *3-5 (N.D. Ill. Aug. 31, 2010) (finding that the fund was entitled to accelerate employer's withdrawal liability while the dispute was being arbitrated after the fund declared the employer to have defaulted under § 1399(c)(5)(B)); Cent. States Se. and Sw. Areas Pension Fund v. Nat' Concrete Prods. Co., No. 15-CV-3739, 2016 WL 4366595, at *3-5 (N.D. Ill. Aug. 16, 2016) (granting fund's motion for summary judgment, including for acceleration of the employer's

---

[1] The Seventh Circuit noted that in the event of a Missed Payment Default under section 1399(c)(5)(A), a fund may declare a default and accelerate withdrawal liability only if, after the arbitrator rules, the employer fails to make a payment and fails to cure the default within sixty days of receiving written notice of the missed payment. See O'Neill, 620 F.3d at 773; see also § 1399(c)(5)(A).

withdrawal liability, after employer ceased operations and was declared to be in default under § 1399(c)(5)(B) while arbitration was pending).

Defendant attempts to distinguish O'Neill by arguing that "O'Neill [ ] did not address the jurisdiction of a [f]ederal [c]ourt to determine a dispute between the parties of whether default has actually occurred based on ERISA, PBGC [r]egulations and/or the Fund's rules." (Def.'s Br. at 12.) To the contrary, the Seventh Circuit made clear that any disputes related to a default determination must be resolved by the arbitrator. O'Neill, 620 F.3d at 772. Moreover, the O'Neill court did not resolve the withdrawal liability dispute; it simply found that if there is a basis for declaring an Insecurity Default, acceleration of the entire amount of withdrawal liability is permissible during the pendency of the arbitration. Id. at 772-75. Defendant further argues that the employer in O'Neill did not dispute whether the default was properly declared, but only whether the withdrawal liability could be accelerated, and "[i]n this case, Defendant has always disputed that an event of default has never occurred, a factual issue . . . to be decided by the arbitrator."[2] (Def.'s

---

[2] In any event, the employer appears to have raised at least some factual issues related to the declaration of default. The Seventh Circuit noted that while the employer admitted that it ceased operations, it denied that its counsel sent an email to the fund explaining that the company was "preparing for its termination and liquidation." O'Neill, 620 F.3d at 771 & n.6.

Br. at 12 (emphasis in original).)  However, the existence of factual issues related to the declaration of default and acceleration of liability does not strip this Court of jurisdiction to direct Defendant to make interim payments pending the arbitrator's decision.  Those issues will be resolved by the arbitrator, but in the meantime, Defendant must comply with the statute's mandate requiring employers to "pay now" and "dispute later."  See O'Neill, 620 F.3d at 772; Rao, 149 F. Supp. 2d at 5; 29 U.S.C. § 1401(d).

Defendant relies heavily on GCIU-Employer Retirement Fund v. Vanard Lithographers, Inc., No. 12-CV-5169, 2013 WL 12080961 (C.D. Cal. June 7, 2013).  However, Vanard actually undermines its position.  In that case, the fund determined that the employer was in default and accelerated the employer's withdrawal liability.  Vanard, 2013 WL 12080961, at *1.  The employer disputed the propriety of the default determination and commenced an arbitration proceeding.  Id. at *1.  Thereafter, the fund filed suit to collect the accelerated withdrawal liability and moved for summary judgment.  Id. at *1-2.  Similar to Defendant's argument here, the employer argued that summary judgment should be denied because "there [was] a dispute of fact regarding whether an event occurred that indicated a substantial likelihood that it would be unable to pay it withdrawal liability." Id. at *3.  At the outset, the court noted that "the question of

17

whether Plaintiffs correctly determined that Defendant was in default within the meaning of § 1399(c)(5)(B) is not properly before this [c]ourt," because the dispute must be arbitrated.  Id. Nonetheless, the court held that "Defendant is required to pay the amount of withdrawal liability assessed, despite its challenge to the validity of Plaintiffs' decision," because "under the pay now, dispute later rule, once a plan sponsor has demanded payment, the employer must make an immediate payment regardless of whether it disputes the propriety of the payment and whether it has submitted the dispute to arbitration."  Id. (internal quotation marks and citations omitted).  Thus, Vanard lends no support to Defendant's argument.

Based on the relevant case law and statutory framework, the Court holds that it has jurisdiction to direct Defendant to remit the entire amount of withdrawal liability due on an interim basis while the arbitration is pending.  The Court further finds that, subject to the determination of the arbitrator, Plaintiffs presented sufficient evidence to establish a basis for declaring Defendant to be in default under section 1399(c)(5)(B), and as a result, this Court's March 10, 2017 Order remains in full force.[3] See Gesualdi, 2017 WL 945090, at *2 (describing Judge Tomlinson's

---

[3] In light of the above, the Court need not address Plaintiffs' argument that Defendant failed to submit the acceleration issue to the arbitrator.

assessment of the evidence of the default under section 1399(c)(5)(B) and the plan rules); (R&R at 33-38). Accordingly, Defendant's motion to dismiss (Docket Entry 86) is DENIED.

## II. Plaintiffs' Motion for Damages, Fees, and Costs[4]

### A. Unpaid Contributions

Plaintiffs request an award of $18,755.86 in unpaid contributions determined to be owed after an audit by the Fund, referred to as the 13-0352 Audit (the "Audit"). (Pls.' Damages Br., Docket Entry 72-11, at 5-6.) The Fund hired Schultheis & Panettieri ("S&P") to conduct an audit of Defendant's books and records and determine whether Defendant "contributed to the Funds in accordance with the applicable collective bargaining agreements, and, if not, to determine the amount of delinquencies" during the period of May 30, 2011 to October 28, 2012. (Pls.' Supp. 56.1 Stmt., Docket Entry 72-12, ¶ 1.)[5] Based on this review,

_____

[4] As discussed, Defendant has not opposed this motion. Moreover, its opposition to Plaintiffs' prior motion for partial summary judgment did not contain any arguments related to Plaintiffs' request for damages, fees, and costs. (See Defs.' Opp. to Pls.' Mot. for Summ. J., Docket Entry 54).

[5] Defendant did not respond to Plaintiffs' Supplemental Rule 56.1 Statement of Facts by filing a Supplemental Counterstatement or otherwise. Therefore, the facts contained in Plaintiffs' Supplemental Rule 56.1 Statement are deemed admitted. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").

S&P found that Defendant owed $18,755.86 in unpaid contributions. (Pls.' Supp. 56.1 Stmt. ¶¶ 7-9; Poulos Decl., Docket Entry 72-6, ¶¶ 11-13.)  Plaintiffs notified Defendant of this delinquency but never received payment.  (Cody Decl., Docket Entry 71, ¶¶ 6-8; Sept. 2013 Letter, Cody Decl. Ex. C, Docket Entry 71-4.)

"ERISA provides that an employer is obligated to make contributions to multiemployer benefit plans under a collective bargaining agreement in accordance with the agreement's terms." Seacost, 97 F. Supp. 3d at 96; see also 29 U.S.C. § 1145.  If the employer fails to comply, the fund is entitled to an award in the amount of the unpaid contributions.  Seacost, 97 F. Supp. 3d at 97; 29 U.S.C. § 1132(g)(2) ("In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan . . . the unpaid contributions.").  Moreover, in awarding such damages, courts have frequently relied on the results of audits similar to the Audit conducted by S&P. See Seacost, 97 F. Supp. 3d at 101; Ferrara v. PJF Trucking LLC, No. 13-CV-7191, 2014 WL 4725494, at *11 (E.D.N.Y. Sept. 22, 2014). As a party to the CBA and the Trust Agreement, Defendant had an obligation to make contributions in amounts consistent with the agreements, and the Audit revealed that between May 30, 2011 and October 28, 2012, Defendant failed to do so.  (CBA at 16; Bulding

Decl., Docket Entry 72, ¶ 7.)  Accordingly, Plaintiffs are awarded $18,755.86 in unpaid contributions.

B. <u>Interest</u>

Plaintiffs request an award of interest on the unpaid contributions of $17,491.06--calculated as of April 14, 2017-- along with $9.25 per day from April 15, 2017 through the date judgment is entered. (Pls.' Damages Br. at 9.)  They contend that interest began to accrue on the unpaid contributions as of September 13, 2013, the date the audit report was provided to Defendant. (Pls.' Damages Br. at 9.)  Additionally, Plaintiffs request interest on the withdrawal liability of $2,225,876--also calculated as of April 14, 2017--along with $1,813.41 per day from April 15, 2017 through the date judgment is entered. (Pls.' Damages Br. at 9.)  Plaintiffs argue that interest began accruing on the withdrawal liability on December 7, 2013, sixty days after the Fund's October 8, 2013 Notice of Default advising Defendant that it had sixty days to cure the default (the "October 2013 Notice"). (Pls.' Br. at 9.)

When the plan prevails it is entitled to "interest on the unpaid contributions . . . determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26." 29 U.S.C. § 1132(g)(2).  The Trust Agreement provides that interest will be calculated "at the rate of 1.5% [one and one-half percent] per month" or eighteen percent

(18%) per year, for "each monthly amount due for each month, from the first day of the month when the payment was due to the date payment was made." (Trust Agmt. at 27.) As of September 23, 2013, the date Plaintiffs provided the Audit report to Defendant, the accrued interest was $5,476.71. (Sept. 2013 Letter at 2.) To calculate the interest between September 23, 2013 and April 14, 2017 (the date the motion was filed), the Court multiples the number of days by the daily interest rate. See Seacost, 97 F. Supp. 3d at 101 (calculating interest on unpaid contributions determined by an audit). That calculation yields $12,015.75.[6] Thus, the total interest as of April 14, 2017 is $17,492.46. Additionally, interest on the unpaid contributions will continue to accrue at a rate of $9.25 per day from April 15, 2017 through the date of the judgment.

For withdrawal liability, the Trust Agreement specifies that "interest shall be charged on any amount in default from the date the payment was due to the date it is paid at the rate of 1 1/2% per month," or eighteen percent per year (18%), "for each monthly amount due for each month." (Trust Agmt. at 36.) Plaintiffs' request interest beginning on December 7, 2013, the

---

[6] The calculation is as follows:
$18,755.86 (amount of delinquent contributions) x .18 (yearly interest rate)= $3,376.05 (total yearly interest)
$3,376.05 (total yearly interest)/ 365 days = $9.25 per day
$9.25 per day x 1299 days = $12,015.75

date by which Defendant was required to cure its default. (Pls.'
Damages Br. at 9.) On the withdrawal liability, using the
methodology outlined above, the Court finds that Plaintiffs are
entitled to an award of $2,255,882.04 in interest accrued as of
April 14, 2017 and an additional $1,813.41 per day through the
entry of judgment.[7] See Seacost, 97 F. Supp. 3d at 103 (calculating
interest on withdrawal liability using similar methodology); see
also Daniello v. PML Furniture Grp. of NJ, Ltd., No. 06-CV-5261,
2009 WL 4722650, at *5 (E.D.N.Y. Dec. 9, 2009) (using similar
methodology to calculate interest based on entire outstanding
amount of withdrawal liability).

C. Liquidated Damages

Plaintiffs request an award of liquidated damages equal
to the interest on both the unpaid contributions and the withdrawal
liability. (Pls.' Damages Br. at 10.) As such, based on the
Court's calculations, Plaintiffs are requesting $17,492.46 in
liquidated damages on the unpaid contributions and $2,255,882.04
in liquidated damages on the withdrawal liability. See supra 22-
23.

---

[7] The calculation is as follows:
$3,677,184 (total amount of withdrawal liability) x .18 (yearly
interest rate) = $661,893.12 (total yearly interest)
$661,893.12 (total yearly interest)/ 365 days = $1,813.41 per
day
$1,813.41 per day x 1244 days = $2,255,882.04

Under Section 1132(g)(2)(C), the plan is entitled to a liquidated damages award in "an amount equal to the greater of . . . interest on the unpaid contributions or . . . liquidated damages provided for under the plan in an amount not in excess of 20 percent" of the unpaid contributions.   29 U.S.C. § 1132(g)(2)(C).   The Trust Agreement specifies that employers are responsible for the maximum amount allowed by section 1132(g)(2)(C)--either the amount of interest on the unpaid contributions or twenty percent of the unpaid contributions, whichever is greater.  (Trust Agmt. at 28.)

Because the interest is greater than twenty percent of the unpaid contributions, the Court finds that Plaintiffs are entitled to an award of liquidated damages in an amount equal to the interest award.  See Daniello, 2009 WL 4722650, at *5; Seacost, 97 F. Supp. 3d at 102. Thus, Plaintiffs are awarded $17,492.46 in liquidated damages for the unpaid contributions and $2,255,882.04 in liquidated damages for the withdrawal liability as of April 14, 2017, the date of their motion.  Additionally, they are entitled to $9.25 per day in liquidated damages on the unpaid contributions and $1,813.41 per day in liquidated damages on the withdrawal liability from April 15, 2017 through the entry of judgment.

D. Audit Costs

Plaintiffs request an award of $2,090.40 in costs related to the Audit.  (Pls.' Damages Br. at 10-11.)  They submit

S&P's Audit report dated February 2, 2013 as support for the request, which reflects that the accounting firm charged the Fund $2,090.40 in fees. (S&P Report, Poulos Decl. Ex. A, Docket Entry 72-7, at 5.)

Courts in this District have interpreted Section 1132(g)(2)(E), which provides that courts may award "such other legal and equitable relief as a court deems appropriate," as a basis for awarding audit costs. See, e.g., Seacost, 97 F. Supp. at 103; Ferrara, 2014 WL 4725494, at *17; see also 29 U.S.C. 1132(g)(2)(E). Additionally, the Trust Agreement provides that when "collection of the [e]mployer's delinquent contributions reported by the audit is referred to the Funds' attorney," the employer must also pay fees associated with an audit of "$350, or such other amounts as the Trustees in their discretion shall apply." (Trust Agmt. at 27.) The Court finds that an award of such costs is appropriate and awards Plaintiffs $2,090.40 in audit costs.

E. Attorneys' Fees and Costs

Plaintiffs request $74,559.75 in attorneys' fees for prosecuting this action. (Pls.' Damages Br. at 12.) Since the case was commenced, seven attorneys, two paralegals, and one legal assistant worked on the case. (Pls.' Damages Br. at 12.) Plaintiffs have submitted time records documenting the hours and

hourly rates requested.  (Time Recs., Smith Decl. Ex. A, Docket
Entry 72-9.)

Plaintiffs have requested the following hourly rates:

| Timekeeper[8] | Date(s) | Rate |
|---|---|---|
| Scott Trivella (Attorney) | 8/29/13-4/21/14 | $400.00 |
| | 10/22/14-12/24/15 | $425.00 |
| | 2/17/17-3/10/17 | $450.00 |
| Denise Forte (Attorney) | 3/10/17 | $450.00 |
| Christopher Smith (Attorney) | 11/25/13-6/24/14 | $400.00 |
| | 7/21/14-7/14/16 | $425.00 |
| | 2/7/17-4/12/17 | $450.00 |
| Jonathan Bardavid (Attorney) | 8/20/13-6/30/14 | $375.00 |
| | 7/3/14-10/8/15 | $395.00 |
| | 2/7/17 | $415.00 |
| James Grisi (Attorney) | 2/19/14 | $375.00 |
| | 12/29/14 | $395.00 |
| Gina Nicotera (Attorney) | 6/23/14-6/30/14 | $275.00 |
| | 7/3/14-10/7/14 | $290.00 |
| Arthur Muller (Attorney) | 1/11/16-1/14/16 | $115.00 |

---

[8] While Plaintiffs submitted time records, they failed to specify
the hourly rates in either their brief or supporting
declaration.  As a result, the Court compiled this information
based on the Time Records and the cursory explanation in
Plaintiffs' brief.  (See Time Records at 1-28; Pls.' Damages Br.
at 12.)

| | 4/11/17 | $305.00 |
|---|---|---|
| Lauren Dammacco (Paralegal) | 2/17/17–3/13/17 | $120.00 |
| Michelle Salerno (Paralegal) | 10/4/13–5/20/14 | $110.00 |
| | 8/13/14–10/13/16 | $115.00 |
| | 2/7/17–4/4/17 | $120.00 |
| Anna Chiarolanza (Legal Secretary) | 2/6/14–5/20/14 | $110.00 |
| | 8/7/14–6/28/16 | $115.00 |

Smith, Trivella, Forte, and Grisi each have over twenty years of experience, Bardavid has twelve years of experience, Nicotera has four years of experience, and Muller has less than a year of experience. (Pls.' Damages Br. at 12.)

Section 1132(g)(2)(D) provides that when a judgment is entered in favor of the plan, the court should award "reasonable attorney's fees and costs of the action, to be paid by the defendant." 29 U.S.C. 1132(g)(2)(D). In other words, "an award of reasonable attorneys' fees and costs [is] mandatory." Daniello, 2009 WL 4722650, at *5; see also Ferrara, 2014 WL 4725494, at *18. Plaintiffs are also entitled to an award of attorneys' fees under the terms of the Trust Agreement. (See Trust Agmt. at 27 ("an Employer in default for five working days shall be obligated to pay . . .[a]ttorney's fees in collection actions . . . equal to the actual amount to be billed to the Trustees by their counsel for work performed in connection with this matter.").)

It is well-established that "the lodestar method--the product of a reasonable hourly rate and the reasonable number of hours required by the case--creates a 'presumptively reasonable fee.'" Ferrara, 2014 WL 4725494, at * 18 (quoting Millea v. Metro-North R.R. Co., 658 F.3d 154, 166 (2d Cir. 2011)). When determining the presumptively reasonable fee, the court should consider "'what a reasonable, paying client would be willing to pay.'" Id. (quoting Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany, 522 F.3d 182, 183 (2d Cir. 2007)). Moreover, while "'[t]he court has considerable discretion' to determine the presumptively reasonable fee, "it should 'bear in mind all case-specific variables that [the Second Circuit] and other courts have identified as relevant to the reasonableness of attorneys' fees in setting a reasonable hourly rate.'" Seacost, 97 F. Supp. 3d at 104 (quoting Arbor Hill, 522 F.3d at 190) (alteration in original)). As the party seeking a fee award, Plaintiffs "bear[ ] the burden of proving the reasonableness and necessity of the hours spent and rates charged," including by submitting contemporaneous time records which identify the attorney, the date, the work performed, and the hours billed. Id.

To determine whether the requested rates are reasonable, the Second Circuit has instructed district courts to consider the prevailing rates in the district where the court is located. Ferrara, 2014 WL 4725494, at *19. Based on the rates awarded in

this district, including cases involving Trivella & Forte LLP, the Court finds that for some of the attorneys, the requested rates are slightly higher than what has been found to be reasonable. See Ferrara, 2014 WL 4725494, at *21 (recommending rates of between $350 and $380 for partners and between $230-$300 for associates); Seacost, 97 F. Supp. 3d at 106-08 (recommending rates of $300 for experienced attorney and $275 for associate); Gesualdi v. Mechanical Insulation Inc., No. 14-CV-0724, 2015 WL 729728, at *11-12 (E.D.N.Y. Feb. 18, 2015) (recommending rates of $400 for partner, $375 for senior associate, $275 for junior associate, and $110 for paralegal). In light of the undersigned's experience with this case and the prevailing rates in this district, the Court finds that the following hourly rates are reasonable: (1) $400 for Trivella, Forte, and Smith; (2) $375 for Bardavid and Grisi; (3) $275 for Nicotera; (4) $115 for Muller in 2016 and $275 in 2017; and (5) $110 for Dammacco and Salerno.[9] See Mechanical Insulation, 2015 WL 729728, at *11-12; Ferrara, 2014 WL 4725494, at *21. The Court further finds that a rate of $90 is reasonable for Chiarolanza, a legal assistant. See Tr. of Local 7 Tile Indus. Welfare Fund v. Star Const. Marble & Granite, Inc., No. 13-CV-

---

[9] It is unclear why Muller's time was billed at a significantly lower rate ($115 per hour) during 2016. Because he is a first-year associate, the Court assumes that he may have been a law clerk in 2016. In any event, the Court approves the requested rate of $115 for Muller's time in 2016.

0925, 2014 WL 173420, at *4 (E.D.N.Y. Jan. 13, 2014) (recommending rate of $90 for legal assistant).

Additionally, the Court has reviewed the time records and finds the hours expended to be reasonable.  While the number of hours is higher than in other ERISA cases in this district, see Ferrara, 2014 WL 4725494, at *21, during the course of this matter the parties litigated several discovery disputes and motions.  It follows that ERISA cases in which the plaintiffs sought a default judgment without any additional motion practice are not a useful metric.  See id. (recommending award of attorneys' fees for 98.7 hours in case that resulted in default judgment).  Therefore, as shown below, the Court awards attorneys' fees of $70,425.75.

| Timekeeper | Rate | Hours | Fees |
|---|---|---|---|
| Scott Trivella | $400.00 | 2.1 | $840.00 |
| Denise Forte | $400.00 | .05 | $20.00 |
| Christopher Smith | $400.00 | 136.6 | $54,640.00 |
| Jonathan Bardavid | $375.00 | 24.75 | $9,281.25 |
| James Grisi | $375.00 | .55 | $206.25 |
| Gina Nicotera | $275.00 | 8.8 | $2,420.00 |
| Arthur Muller | $115.00 (2016) | 2.45 | $281.75 |
|  | $275.00 (2017) | 4.4 | $1,210.00 |
| Lauren Dammacco | $110.00 | .7 | $77.00 |
| Michelle Salerno | $110.00 | 11.05 | $1,215.50 |

| Anna Chiarolanza | $90.00 | 2.6 | $234.00 |
| **TOTAL** | | 194.05 | **$70,425.75** |

Finally, Plaintiffs request $876.34 in costs, which includes the filing fee, expenses associated with service of process, postage, and PACER fees. (Pls.' Damages Br. at 13.) As support for their request, Plaintiffs submitted an itemized list of these expenses. (See Time Records at 29.) As discussed, Section 1132(g)(2)(D) provides that the Fund may recover the costs associated with this action. 29 U.S.C. § 1132(g)(2)(D). Moreover, courts in this district routinely award such costs. See Mechanical Insulation, 2015 WL 729728, at *12 ("[A] court will generally award those reasonable out-of-pocket expenses incurred by the attorney[s] and which are normally charged [to] fee paying clients.") (internal quotation marks omitted; second alteration in original); see also Tr. of Local 7, 2014 WL 173420, at *4; Seacost, 97 F. Supp. 3d at 108-09. The Court finds that the requested costs are reasonable and awards $876.34 in costs.

III. Plaintiffs' Motion to Restrain and Attach Assets

Plaintiffs request that the Court enter "a prejudgment order . . . restraining assets currently in Defendant Scara-Mix, Inc.'s possession and for a Writ of Attachment against any royalty payments which become due and owing to Defendant from Eastern Concrete Materials, Inc. ("Eastern") pursuant to the Royalty

Agreement between Scara-Mix, Inc. and Eastern . . . or payments to Scara-Mix, Inc. from any other source." (Pls.' Attach. Br., Docket Entry 73-3, at 1.) They make two specific arguments: (1) that the Court should restrain Defendant's assets pursuant to New York Civil Practice Law and Rules ("CPLR") section 5229, and (2) that the Court should issue a writ of attachment pursuant to Federal Rule of Civil Procedure 64 and CPLR section 6201. (Pls.' Attach. Br. at 3-5.) However, because the Court is directing the Clerk of the Court to enter judgment for the withdrawal liability, unpaid contributions, interest, fees, costs, and liquidated damages, see infra 34-35, Plaintiffs' requests appear to be moot. The remedies provided for by CPLR sections 5229 and 6201, as well as Federal Rule 64, are pre-judgment remedies. See N.Y. C.P.L.R. § 5229 ("In any court, before a judgment is entered . . . the trial judge may order examination of the adverse party and order him restrained with the same effect as if a restraining notice had been served upon him after judgment."); N.Y. C.P.L.R. § 6201 (specifying that an order of attachment may be issued "where the plaintiff has demanded and would be entitled . . . to a money judgment against one or more defendants"); FED. R. CIV. P. 64 (providing that federal district courts can utilize "every remedy [that] is available . . . , under the law of the state where the court is located . . . for seizing a person or property to secure satisfaction of the potential judgment"). With the forthcoming judgment in hand,

Plaintiffs can pursue the appropriate enforcement mechanisms under New York law. Therefore, the motion for a pre-judgment order restraining Defendant's assets and for a writ of attachment is DENIED.[10]

Plaintiffs' request for an award of fees and costs associated with this motion is similarly DENIED. At least some of the costs and fees incurred in connection with the Attachment Motion have been awarded in this Order. See Time Records at 27 (documenting hours spent by Muller on research and drafting). To the extent Plaintiffs seek additional fees associated with the motion pursuant to Section 1132(g)(2)(D) and the provisions of the

---

[10] In a footnote, Plaintiffs state: "In addition to and/or in the alternative, Plaintiffs seek a preliminary injunction freezing Defendant's assets and ordering any proceeds paid to Defendant from Eastern or any source be forwarded to Plaintiff[s]" pursuant to Federal Rule of Civil Procedure 65 and New York Civil Practice Law and Rules 5526 and 6301. (Pls.' Attachment Br. at 1, n.1.) Aside from the language in this footnote, Plaintiffs fail to elaborate on the basis for this request or cite any additional authority to support it. Further, Plaintiffs' brief does not contain any arguments regarding the elements typically analyzed by district courts when considering a motion for a preliminary injunction. See, e.g., Johnson v. Connolly, 378 F. App'x 107, 108 (2d Cir. 2010) ("Ordinarily, a party seeking a preliminary injunction [must] show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.") (internal quotation marks omitted) (alteration in original). Accordingly, to the extent Plaintiffs' motion seeks a preliminary injunction, that request is DENIED WITHOUT PREJUDICE.

Trust Agreement, they are granted leave to file a supplemental motion for attorneys' fees and costs at the conclusion of the case.

CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss (Docket Entry 86) is DENIED, Plaintiffs' motion seeking damages (Docket Entry 70) is GRANTED, and Plaintiffs' motion for a writ of attachment (Docket Entry 73) is DENIED.  The Clerk of the Court is directed to enter judgment in favor of Plaintiffs as follows:

| | |
|---|---|
| **Outstanding Withdrawal Liability** | $3,677,184.00 |
| **Unpaid Contributions** | $18,755.86 |
| **Interest on Unpaid Contributions** Calculated through 4/14/17 | $17,492.46 |
| **Interest on Withdrawal Liability** Calculated through 4/14/17 | $2,255,882.04 |
| **Liquidated Damages on Unpaid Contributions** Calculated Through 4/14/17 | $17,492.46 |
| **Liquidated Damages on Withdrawal Liability** Calculated Through 4/14/17 | $2,255,882.04 |
| **Audit Costs** | $2,090.40 |
| **Attorneys' Fees** | $70,425.75 |
| **Costs**                                              + | $876.34 |

**$8,316,081.35**

**Daily Interest on Unpaid Contributions**

From 4/15/17 through Entry of Judgment   +    $9.25/day

**Daily Interest on Withdrawal Liability**

From 4/15/17 through Entry of Judgment   +    $1,813.41/day

**Continued Accrual of Liquidated Damages**

**On Unpaid Contributions** From 4/15/17

through Entry of Judgment                 +    $9.25/day

**Continued Accrual of Liquidated Damages**

**On Withdrawal Liability** From 4/15/17

through Entry of Judgment                 +    $1,813.41/day


                              SO ORDERED.


                              /s/ JOANNA SEYBERT
                              Joanna Seybert, U.S.D.J.

Dated:     November   17  , 2017
           Central Islip, New York